UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In Re:                                              Chapter 11
                                                    Case No. 1-14-40786-nhl
Etienne Estates at Washington LLC

            Debtor.

------------------------------------------------------------X

## DECISION ON OBJECTION TO CLAIM AND PLAN CONFIRMATION

APPEARANCES:

Kevin Nash, Esq.                          Mark A. Frankel, Esq.
Goldberg Weprin Finkel Goldstein LLP      Blackenroth Frankel & Krinsky, LLP
1501 Braodway, 22nd Floor                 800 Third Avenue
New York, NY 10036                        New York, NY 10022
*Attorneys for the Debtor*                *Attorneys for the Mortgagee*

                                          Dan M. Rice, Esq.
                                          Einig & Bush LLP
                                          420 Lexington Ave. Suite 2320
                                          New York, NY 10170
                                          *Attorneys for the Mortgagee*

NANCY HERSHEY LORD
UNITED STATES BANKRUPTCY JUDGE

Before the Court are three related matters: the Application of Etienne Estates at Washington, LLC (the "Debtor") to Confirm its Third Amended Chapter 11 Plan of Reorganization, ECF No. 98; an Objection to Plan Confirmation and Exclusivity Extension made by secured creditor JJAM Capital LLC ("JJAM"), ECF No. 111; and the Debtor's Objection to JJAM's claim, ECF. No. 97. The Court held an evidentiary hearing on the issues raised by the parties in these pleadings. The Court is now tasked with fixing the amount of JJAM's claim, determining whether the Debtor is able to cure its default under 11 U.S.C. § 1124(2), and deciding whether to confirm the Debtor's plan on the basis of the outcome of the previous inquiries. Based on the following discussion, the Court fixes JJAM's claim in the amount of $2,726,396.97; holds that, of the total claim, $779,764.83 may be tendered to cure and reinstate the terms of the Consolidated Note; and grants the Debtor leave to amend its plan accordingly.

I.      Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  This decision constitutes the Court's findings of fact and conclusions of law to the extent required by Federal Rule of Bankruptcy Procedure 7052.

II.      Background

The Debtor filed a voluntary chapter 11 petition on February 26, 2014. The Debtor's principal asset is a piece of real property located at 301 Washington Avenue, Brooklyn, New York, 11205 (the "Property"), which the Debtor acquired on September 3, 2004. Joint Trial Statement 9, ECF No. 113. The Certificate of Occupancy on record with the Department of Buildings as of the filing date lists the Property as a three story residential building for seven

apartments. Certificate of Occupancy 1, JJAM Trial Ex. 38. The Debtor's principal, Johanna

Francis ("Francis"), and her son, occupy the Property as their residence, while the first floor is

used as an office for various real estate companies also owned and operated by Francis.

JJAM currently holds a $1,800,000 note and a series of mortgages encumbering the

Property dating back to April 2002, all of which were assigned to JJAM by First Central Savings

Bank ("First Central"). Of the documents now held by JJAM, the following are disputed here: a

Home Equity Line of Credit Agreement ("HELOC"); the Consolidated Adjustable Rate Note for

$1.8 million ("Consolidated Note"); a $1.8 million Consolidated Mortgage ("Consolidated

Mortgage"); a Consolidation Extension and Modification Agreement ("CEMA"); and a

Forbearance and Loan Modification Agreement ("Forbearance Agreement").

a.  HELOC, Consolidated Note, and Consolidated Mortgage

The HELOC, executed on September 28, 2006, was the culmination of several prior re-

financings. *See* Joint Trial Statement 1-9, ECF No. 113. Those earlier re-financings initially

resulted in a consolidated note and mortgage in the amount of $1,129,448.43, executed in favor

of Washington Mutual Bank ("WAMU") ("WAMU Consolidated Note"), and later assigned to

First Central. *Id.* at 9-11; Obj. to Plan & Exclusivity Ext. 5, ECF No. 111. The parties agree that

WAMU did not endorse these earlier documents to First Central. Joint Trial Statement, at 14.

Subsequent to the assignment, First Central loaned the Debtor an additional $670,552,

memorialized by the HELOC and a mortgage for that amount. Obj. to Plan & Exclusivity Ext. 6,

ECF No. 111.

Three other documents were executed along with the HELOC on September 28, 2006.

First, the parties signed the Consolidated Note, representing an indebtedness to First Central of

the previous re-financed amount and the additional loan under the HELOC. Joint Trial Statement

3

12. The Consolidated Note is identical to the HELOC agreement, save for a stamped legend at the top of the first page.[1] *See* Consolidated Note 1, JJAM Trial Ex. 28. The second and third documents were the CEMA and the Consolidated Mortgage, each in the amount $1.8 million. *See* Consolidation, Ext., & Mod. Ag., JJAM Trial Ex. 29. Neither of these documents was recorded. Obj. to Plan & Exclusivity Ext. 7, ECF No. 111.

Under the Consolidated Note and Consolidated Mortgage, Debtor was to make monthly payments on a variable interest rate, assessed as a 1.75% margin rate plus the prime rate. Consolidated Note ¶5. The loan was set to mature after 300 months, in 2031. *See Id.* at ¶1. Furthermore, the documents required the Debtor to maintain insurance on the Property and to pay all taxes. *Id.* at ¶10; Consolidated Mortgage 588, JJAM Trial Ex. 30. Proof of these payments was to be offered upon First Central's request. Consolidated Mortgage 588. If "any unpaid taxes, assessments, property insurance or other sums as provided under this Agreement" were not made, First Central was entitled to make such payments on the Debtor's behalf, which would constitute additional "loans." Consolidated Note ¶2; Consolidated Mortgage 588. The agreements also obligated the Debtor to pay First Central's attorney's fees, including "reasonable and actual costs of collection, or foreclosure such as [] court costs and reasonable attorney's or trustee's fees." Consolidated Note ¶14. Any failure on the Debtor's part to make monthly payments would result in a late fee of 2% of the late payment. *Id.* at ¶7.

---

[1] The legend reads:

    Consolidated Adjustable Rate Note. This Note amends and restates in their entirety, and is given in substitution for the Notes described in Exhibit A of the New York Consolidation, Extension, and Modification Agreement dated the same date as this Note.

Consolidated Note 1, JJAM Trial Ex. 28.

b. The Forbearance Agreement

The Debtor remained current on the HELOC and Consolidated Note until late 2007, when the loan went into default. Rather than foreclose on the Property, First Central entered into the Forbearance Agreement with the Debtor, which became effective on June 1, 2008. Under the Forbearance Agreement's terms, the Debtor acknowledged a principal balance due of $1,787,662.50, and arrears of $145,536.16. Forbearance Ag. ¶1, JJAM Trial Ex. 60.[2] Repayment of the arrears was to be made at the rate of $2,425.60 per month, and repayment of the remaining balance through May 1, 2009, at an interest rate of 5%, or $7,448.59 a month.[3] *Id.* at ¶ 3.The loan was set to mature after 60 months, in May of 2013. *Id.*

The Forbearance Agreement provided for a series of default terms, which appear in Paragraphs 5 and 7. Paragraph 5 read:

> 5. Should Borrower (a) convey title to the Premises or (b) abandon the Premises or (c) fail to provide evidence of hazard insurance in force by June 10, 2008, or (d) remain in breach of this Agreement for seven days after written notice of the same, this Agreement shall be cancelled and the original terms of the Note, including, without limitation, the interest rate, will apply as if this Agreement had never been executed.

Forbearance Ag. ¶ 5. Paragraph 7 provided that, "If the default has not been cured within such seven day period, [First Central] may enforce its rights and remedies hereunder and under the Note." *Id.* at ¶7. This explicitly included the right to "immediately institute a foreclosure action." *Id.* Further, Paragraph 11 provided that,

> Except as otherwise specifically provided in this Agreement, the terms of the Note will remain unchanged including, without limitation, the events of default thereunder, and the Borrower obligated pursuant to the terms thereof. Nothing herein shall be understood or construed to be a satisfaction or release in whole or

---

[2] In advance of the Forbearance Agreement's execution, Debtor tendered a check in the amount of $12,337.50 to First Central, which was applied against the principal balance. The Forbearance Agreement therefore shows a principal balance of $1,787,662.50, rather than $1,800,000.

[3] From June 1, 2009 through May 1, 2010, the amount due monthly on the balance was set to increase to $8,938.31; after May 2010 the amount increased again to $10,717.94. Forbearance Ag. ¶ 3, JJAM Ex. 60.

in part of the Note but [First Central] will provide a satisfaction or release if and when Borrower fully performs all of their obligations hereunder and all sums owing to [First Central] have been paid in full.

¶11. The Debtor defaulted on the Forbearance Agreement in 2009, when it failed to pay monthly installments.

   c.  Bankruptcy

In June of 2011, MERS as nominee for FCSB by recorded Assignment of Mortgage assigned the HELOC and Consolidated Note back to First Central. First Central then initiated a foreclosure action in New York Supreme Court, Kings County in October of 2011. After First Central sought the appointment of a receiver in the New York action, Debtor filed its chapter 11 petition. Post-petition, First Central assigned its Notes and Mortgages, as well as all other loan documents, to JJAM.

During the course of this case, the Debtor has regularly made adequate protection payments of $5,000 a month to JJAM, and proposed two plans, neither of which has been confirmed. The Debtor premised these previous plans on a cram down under the principles of *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004). With its Third Amended Plan, the Debtor has instead attempted to leave JJAM's claim unimpaired by curing its default under the Forbearance Agreement pursuant to 11 U.S.C. § 1124. The Court has previously approved the Debtor's Third Amended Disclosure Statement, ECF No. 108-1.

   III.    Objection to JJAM's Proof of Claim

The Debtor's objection to JJAM's claim requires a determination of three related issues: the amount of JJAM's allowed claim; whether the unrecorded Consolidated Mortgage is enforceable; and if so, whether JJAM has standing under New York law to enforce the loan documents that it currently holds.

a. JJAM's Claim Amount

JJAM filed an amended Proof of Claim on February 24, 2015, in the amount of $2,538,584.00. JJAM Amended Proof of Claim, Claim 4-3. The Debtor argues that JJAM overstated the amount due under the various loan agreements.

A properly filed proof of claim constitutes prima facie evidence of that claim's validity, Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."). Upon a party's objection pursuant to 11 U.S.C. § 502(b), the court must fix the amount of such claim.[4] The objecting party has the burden of overcoming the claim's prima facie validity. *See Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. BAP 2000), *aff'd* 242 F.3d 367 (2d Cir. 2000). However, once the objecting party has produced sufficient evidence to undermine facts in the proof of claim, the burden shifts to the claimant to prove validity by a preponderance of the evidence. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 174 (3d Cir. 1992).

Determining the amount of JJAM's allowed secured claim requires an inquiry into the parties' underlying agreements and applicable nonbankruptcy law. *See* § 502(b)(1). In construing the parties' agreements, the Court recognizes the principle that a writing should be enforced according to its terms "when parties set down their agreement in a clear, complete document." *Signature Realty, Inc. v. Tallman*, 2 N.Y.3d 810, 811 (2004) (quoting *R/S Assocs. v. N.Y. Job*

---

[4] In relevant part, Sections 502(a) and (b) provide that:

    (a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest…objects.

    (b) …If such objection to claim is made, the court, after notice and hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount…

    (1) [unless] such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured…

11 U.S.C. § 502(a)-(b).

*Dev. Co.*, 98 N.Y.2d 29, 32 (2002)). Where the intent of the parties can be ascertained from the

face of the instrument, the Court may not consider matters extrinsic to the agreement itself.

*Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 572-73 (1986). In discerning intent, contract provisions

must be interpreted to give effect to the parties' reasonable expectations at the time of contract

formation. *Omni Berkshire Corp. v. Wells Fargo Bank*, 307 F. Supp. 2d 534, 539 (S.D.N.Y.

2004). This requires reading the clauses of a contract together contextually to provide meaning.

*See HSBC Bank USA v. Nat'l Equity Corp.*, 279 A.D.2d 251, 253 (N.Y. App. Div. 1st Dep't

2001).

JJAM asserts that it is entitled to $2,819,196.42 as of May 18, 2015, which is the

stipulated cutoff date for the claim calculation ("Cutoff Date"). Their current calculation is

comprised of the following amounts:

- $1,787,662.50 for principal and $145,536.15 for interest as of June 5, 2008, both of which were stipulated amounts in the Forbearance Agreement;
- $406,641.75 for post-Forbearance Agreement interest through the Cutoff Date;
- $150,227.24 for real estate tax and water advances tendered on Debtor's behalf;
- $19,794.26 for property insurance payments tendered in the Debtor's behalf;
- $41,672.40 for late fees and interest on arrears; and
- $267,612.17 for attorney's fees.

JJAM's Proposed Findings of Fact & Conclusions of Law 1, ECF. No. 149.

The Debtor, on the other hand, argues that the claim should be capped at $2,306,245.29,

with the possibility of further reductions. The Debtor does not dispute the principal amount of

$1,800,000 and arrears of $145,536.15 as stipulated in the HELOC and Forbearance Agreement,

and therefore begins its calculation with these amounts. Debtor's Proposed Findings of Fact &

Conclusions of Law 4, ECF. No. 148. However, the Debtor argues that the Forbearance

Agreement arrears should be reduced to $76,726.55 in light of the sixteen payments made

against the arrears, totaling $38,809.60, and an additional reduction of $30,000 in other

8

unreconciled adjustments promised during negotiations leading to the Forbearance Agreement. *Id.* at 5. The Debtor further asserts that this total should be capitalized and added to the principal amount pursuant to the HELOC. *Id.* at 4. The Debtor would further subtract $12,337.50 from this new principal amount, for a payment made prior to the Forbearance Agreement, as well as another $935.88—a payment made but uncredited. *Id.* Thus, according to the Debtor's calculation, the principal balance due should be no greater than $1,863,453.17. *Id.*

To this amount the Debtor would add an additional $442,792.12 for post-Forbearance Agreement interest, a number derived using the interest rate under the HELOC and Consolidated Note terms, and subtract $60,000 in adequate protection payments made between the petition date and the Cutoff Date. *Id.* at 6. The Debtor would not add this amount to the principal, but would instead tender it to JJAM under the plan to cure the default under the Forbearance Agreement.

The Debtor would not include any further payments for taxes, insurance, and fees. The Debtor does not dispute that payments were advanced for taxes and insurance, but instead asserts that the Fair Credit Billing Act bars collection on those advances. It reasons that the HELOC was in reality a personal loan, despite being provided to a corporate borrower, and therefore triggers protections under the Fair Credit Billing Act. Moreover, the Debtor argues that attorney's fees are unreasonable and not properly costs of "collection" recoverable under the HELOC and Consolidated Note. *Id.* at 6.

Based on the evidence adduced at the hearing, the Court finds that the Debtor has sufficiently undermined the prima facie validity of JJAM's claim. Since the Forbearance Agreement unambiguously declares that, upon default, the terms of the Consolidated Note apply, the terms of that agreement dictate the amount due to JJAM. Nevertheless, the Court finds that

JJAM has not adequately established its entitlement to the amount of its claim under that document. *See Reilly* 245 B.R. at 773 ("The ultimate burden rests with the claimant."). Accordingly, the Court will compute the claim using the terms of the Consolidated Note and HELOC.

1. Base Amounts

The Court finds that the base amount of principal due is $1,786,726.62, which is the amount stipulated in the Forbearance Agreement, less an additional payment made in June of 2009. Forbearance Ag. ¶1; First Central Billing Statements 65, Debtor's Trial Ex. I. This number includes that $12,337.50 payment tendered prior to the execution of the Forbearance Agreement against the Consolidated Note's principal balance of $1,800,000. An additional $935.88, which was paid against the principal prior to the Debtor's default under the Forbearance Agreement, is also deducted.

The Debtor owes arrears under the Consolidated Note and HELOC, but in the reduced amount of $106,726.55. This number accounts for the sixteen payments of $2,425.60 tendered against the arrears under the Forbearance Agreement, and an adjustment offered by JJAM in the amount of $2,106.08 for miscalculated interest with a 360-day year under the HELOC. *See* JJAM's Proposed Findings 12, ECF No. 149. Contrary to the Debtor's claims, however, the HELOC does not provide that the arrears be capitalized and added to the principal. Paragraph 2 of that document provides that additional "loans" advanced by the lender are to be capitalized and added to the principal loan amount. As described above, "loans" include advances made for items such as taxes or insurance—in other words, additional sums offered by the lender on the borrower's behalf. It is unclear how arrears on the HELOC fall within the category of "loans" so defined, and the Court finds that they do not.

Furthermore, at this time, the arrears amount is not subject to additional reductions based on any adjustments allegedly discussed between Francis and First Central. Francis testified at the hearing that she and Joseph Pistilli, Chairman of First Central, discussed reductions in the principal amount to be included in the Forbearance Agreement. Tr. 4-29-15, 70:16-20, ECF No. 125-1. Among the reasons cited by the Debtor for these reductions were incorrect billing and unapplied payments under the HELOC, *id.*, as well as concerns about the HELOC being improperly executed and provided to a corporate borrower. Debtor's Proposed Findings 6-7, ECF No. 148. Despite these assertions, Francis's testimony regarding such discussions with First Central lacked specificity, and does not outweigh the fact that monthly payments were made at the agreed amount for almost a full year. *See* Etienne Estates at Washington LLC Account Reconciliation, JJAM Trial Ex. 56; Etienne Estates at Washington LLC Account Reconciliation, Debtor's Trial Ex. H. Thus, the most compelling evidence of arrears owed is the amount stipulated in writing.[5]

    2. Post-Forbearance Interest

The Court finds the amount of interest due on the Forbearance Agreement to be $442,557.39, based upon the following analysis. Pursuant to the Forbearance Agreement, the interest rate in the Consolidated Note applies upon a default. *See* Forbearance Ag. ¶2. Accordingly, interest is calculated as the prime rate plus the 1.75% margin. From the time of default to the Cutoff Date, the prime rate was 3.25%. The applicable interest rate on the post-

---

[5]    The Court does find, however, that First Central failed to make adjustments to the variable interest rate under the HELOC agreement for the months of October and November 2007, and of February and May 2008. *See* Billing Statements, Debtor's Trial Ex. I. But, on the record before it, the Court does not possess sufficient information to determine the precise amount to which this particular error reduces JJAM's claim. Accordingly, the Court has not included this potential reduction in calculating the total claim and cure amounts.
    The parties may submit affidavits regarding the amount owed to the Debtor because of the incorrect interest charges related to these four months. Upon receipt of the parties' calculations, the Court will set the amount, which will be subtracted from the Consolidated Note and HELOC arrears. In turn, that number will be subtracted from the amount required to cure the Debtor's default and reinstate the Consolidated Note.

Forbearance Agreement interest owed is therefore 5%, accruing monthly, which is uniform with the rate applicable under the Forbearance Agreement itself. Thus, the total amount of interest accrued under the Forbearance Agreement at 5% from execution to the Cutoff Date (June 2008 to May 2015) is $621,518.83. From this amount, $118,961.44 is subtracted for all payments made against the interest under the Forbearance Agreement, together with an additional deduction of $60,000, consisting of monthly adequate protection payments through the Cutoff Date.

     3. Property Taxes Advanced

     JJAM has demonstrated that First Central paid property taxes from December of 2010 through March of 2014, and the Debtor does not dispute that such payments were made. The Debtor contends, however, that because the HELOC agreement incorporates the terms of the Fair Credit Billing Act ("FCBA"), *see* Consolidated Note ¶18, the entire agreement comes under the Truth in Lending Act ("TILA"), and First Central's failure to provide notice of tax advances renders the expenditures non-reimbursable. While it is true that the TILA requires advance notice of a lender's expenditures on a borrower's behalf, the question is not what the Act requires, but rather whether its requirements apply here at all. The Court finds that they do not.

     TILA, of which FCBA is a part, applies only to consumer credit transactions, and therefore does not impact credit extended "for business, commercial, or agricultural purposes." 15 U.S.C. § 1603(1). Whether a credit transaction is for consumer or commercial purposes is ultimately a question of the borrower's primary motive, which is determined by an assessment of the "entire transaction and surrounding circumstances."[6] *Mauro v. Countywide Home Loans,*

---

[6] The Ninth Circuit has laid out five factors for determining the purpose of a loan:
    (1)  The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.

*Inc.*, 727 F. Supp. 2d 145, 153 (E.D.N.Y. 2010). The burden of proving that a loan was acquired

primarily for personal, rather than commercial, reasons rests on the plaintiff (here, the Debtor).

*Id.*

The Debtor does not explicitly address the primary motive in acquiring the HELOC loan,

but appears to rely on two facts that imply a personal purpose. First, the Debtor points out that

Francis and her son reside in the Property, and did at the time of the HELOC's execution.

However, evidence that the Debtor's principal lives in the Property does not settle the primary

purpose inquiry, and is here outweighed by the circumstances surrounding the loan's execution.

Francis testified that she filled out a loan application to refinance the WAMU Consolidated

Mortgage.[7] 4-29-15 Tr. 55:24-25, 56:1; *see* Uniform Residential Loan App., JJAM Trial Ex. 16.

On that application, she stated that the primary purpose of the loan was to "Refinance," and

indicated that the property was to be used for "Investment" purposes, rather than as a "Primary

Residence." Loan App. 62, Ex. 16. Francis also responded "No" to the question "Do you intend

to occupy the property as your primary residence?" and entered a Connecticut address in the

"Present Address" field. *Id.* at 62, 64. Moreover, the Debtor's actual use of the loan suggests the

accuracy of the purpose as indicated on the application. *See Goff v. Utah Funding Commercial*,

*Inc.*, No. 2:09-CV-00680, 2009 WL 4665800, at *3 (D. Utah 2009) (relying in part on how the

---

    (2)  The degree to which the borrower will personally manage the acquisition. The more personal
          involvement there is, the more likely it is to be business purpose.
    (3)  The ratio of income from the acquisition to the total income of the borrower. The higher the
          ratio, the more likely it is to be business purpose.
    (4)  The size of the transaction. The larger the transaction, the more likely it is to be a business
          purpose.
    (5)  The borrower's statement of purpose for the loan.

*Mauro*, 727 F. Supp. 2d at 153 (citing *Thorns v. Sundance Properties*, 726 F.2d 1417, 1419 (9th Cir. 1984)).
[7]At the hearing there was some question as to whether Francis was actually involved in filling out the application.
*See* 4-30-15 Tr. 111:15-18 Handwritten Loan App., JJAM Ex. 15. It is apparent from Francis's testimony, and from
the fact that the handwritten application bears Francis's signature, that she was involved with its execution. *See*
Handwritten App. 304. Further, the contents of that written application match those of the typed application. *See* 4-
30-15 Tr. 115:10-13 (explaining that the handwritten application is submitted by the borrower, and then copied and
digitally populated by First Central's computers); Uniform Residential Loan App., JJAM Trial Ex. 16.

loan was used to determine primary purpose). At the hearing, Francis testified that the loan was used primarily to satisfy the debt owed to WAMU, while the remainder was used "to pay for work on the property, pay down portions that we advanced for work, and then others were loaned [sic]." 4-29-15 Tr. 62:1-7. Viewed in light of the further facts that the Property is readily available to be used as rental property, and that the first floor is occupied by Francis's offices for her various real estate and construction companies, *see* 4-29-15 Tr. 52:14-21, 53:23-24, the application and use of the loan suggests that the HELOC was meant to refinance existing debt for investment purposes.

Second, the Debtor relies on the fact that a HELOC is a loan vehicle reserved for individual borrowers, which was mistakenly issued to a corporate borrower here. While this is true, *see* 4-30-15 Tr. 109:15-21, First Central's error does not bear on the Debtor's or Francis's intent. Contrary to the Debtor's implication, Francis testified that she did not intend to enter into a HELOC agreement, and, as explained above, the application submitted to First Central suggested that the loan was meant for investment purposes. *See* 4-29-15 Tr. 58:9-17. On this evidence, it appears that all parties involved would have understood themselves to be entering into a commercial loan. *See Corcoran v. Saxon Mortg. Servs., Inc.*, No. 09-11486, 2010 WL 2106179, at *3 (D. Mass. May 24, 2010) (finding that a borrower's representation to a lender that a loan would be used to purchase an investment property evidenced a commercial intent).

The circumstances surrounding its execution indicate the HELOC was meant primarily for commercial purposes.  Accordingly, TILA does not apply here, and the Debtor must reimburse JJAM for First Central's tax advances in the amount of $145,180.55.

4. Water Advances

Just as the tax advances are not barred by TILA's notice requirements, neither are the water advances. Nor are the water advances disallowed because the Debtor had previously arranged an installment plan with the Water Department to pay down overdue bills. When First Central paid the Water Department $5,095.79 on the Debtor's behalf, it paid the remaining balance due under the Debtor's arrangement. *See* Billing Statements, Debtor's Trial Ex. I 117, 127. First Central, and JJAM in effect, stepped into the shoes of the Water Department by paying this claim. Accordingly, the Debtor now owes JJAM $5,095.79 on account of water advances.

5. Insurance

As established above, the Consolidated Note and Mortgage, as well as the Forbearance Agreement, required the Debtor to maintain property insurance. The terms of the Consolidated Note and Mortgage provided that the Debtor was to offer proof of insurance upon request, a requirement that continued under the Forbearance Agreement. If the Debtor failed to provide proof of insurance, the parties' agreement permitted the lender to secure insurance on the Debtor's behalf. The Debtor has demonstrated to the Court that it maintained insurance on the Property, but, nevertheless, both First Central and JJAM paid for additional insurance policies. This result is either the product of the lenders' failure to request proof of insurance, which would render the advances unnecessary and therefore non-refundable, or the Debtor's failure to provide proof upon request, in which case repayment would be due from the Debtor.

In the case of First Central's insurance payments of $10,165.08, the former is true. No evidence was proffered that First Central requested proof of insurance from the Debtor. At the hearing, JJAM offered the testimony of Pilar Valenzuela, a First Central Employee, who explained the process for requesting proof of, and placing, insurance:

15

> The standard procedure for forced place insurance is we would request information regarding the insurance from the borrower. If we fail to receive that information and we had no insurance information in the file forced place insurance would be placed.

Tr. 4-30-15, 106:8-9, ECF No. 135-1. While Ms. Valenzuela's statement tracks the procedure outlined in the loan documents, it does very little to show that First Central followed procedure in this particular case. Because of a lack of evidence showing that a request was made on the Debtor, First Central's $10,165.08 insurance payment is not refundable.

The opposite is true of the $9,629.18 advanced by JJAM. JJAM has adequately shown proof of request in the form of a "Hello Letter," sent to the Debtor at the Washington Avenue address. See 9-24-14 Letter, JJAM Trial Ex. 90. This triggered the duty to provide proof of insurance, which the Debtor apparently failed to do. *See* Tr. 6-25-15 28:9-17, ECF No. 137-1. Accordingly, JJAM was justified in acquiring insurance, and should be refunded the $9,629.18 it paid in premiums.

6. Attorney's Fees

Section 506(b) of the Code permits an oversecured creditor to collect "any reasonable fees, costs, or charges provided for under the [parties'] agreement." 11 U.S.C. § 506(b). Here, JJAM has requested $267,612.17 in attorney's fees from the Debtor, in accordance with the "Costs of Collection" provision of the HELOC and Consolidated Note. *See* Consolidated Note ¶14. That provision entitles the party only to "reasonable and actual costs of collection, or foreclosure such as your court costs and reasonable attorney's" fees, which the Debtor claims does not extend to First Central's, and later JJAM's, actions here. *Id.* Debtor has also expressed concern that the hours billed are vague and duplicative, which are further grounds for reduction. JJAM disagrees on both points.

The Court finds that JJAM is entitled to attorney's fees under the HELOC and Consolidated Note, as all of its actions fall within the realm of "costs of collection." Both JJAM and First Central have attempted to obtain the benefit of their investment, and a reasonable interpretation of the Consolidated Note suggests that such actions are consistent with those of "collecting," *See Zissu v. Bear, Stearns & Co.*, 805 F.2d 75, 79-80 (2d Cir. 1986) (looking to what the parties would reasonably have expected an indemnification clause to cover based on its terms). The bulk of the fees JJAM seeks to recoup are related to defending the validity of the loan documents and its claim; the remainder, such as efforts to vacate the automatic stay, also relate directly to collecting in what has been a drawn out collection process. Nothing in the "Costs of Collection" provision itself suggests that JJAM and First Central would not be entitled to fees related to efforts that were responsive to the Debtor's own actions or trial strategies. Accordingly, the Court disagrees with the Debtor's assertion that JJAM is seeking fees related to legal claims only "incidental" to collection. *See Jackson v. Oppenheim*, 533 F.2d 826, 831 (2d Cir. 1976) (denying that "costs of collection" included defending an independent securities law claim).

However, the Court finds that the total amount requested must be reduced by 20%. The lenders' general ends may be reasonable, but the same cannot be said for the time spent pursuing them. It has long been understood that a request for attorney's fees will be honored only when supported by adequate documentation of services rendered. *See Hensley v. Eckhart*, 461 U.S. 424, 433 (1983) ("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly."). Adequate documentation entails not only listing the number of hours worked, but also providing sufficient description of how those hours were

spent. *See, e.g.*, *Jackson v. Cassellas*, 959 F. Supp. 164, 168-70 (W.D.N.Y. 1997) (discussing the reduction of fee awards for vague billing records). Without a degree of specificity that includes, at minimum, the subject of the activity and its necessity, it becomes difficult to meaningfully review the request and, in this case, to determine whether the fees are both "reasonable and actual costs of collection." *See id.* at 168-69. While JJAM provided ample records of the time billed by Mark Frankel for Backenroth Frankel & Krinsky, *see* Etienne Estates at Washington LLC Legal Services by Backenroth Frankel & Krinsky LLC, JJAM Trial Ex. 64.1, and Dan Rice for Einig & Bush LLP, *see* Legal Services by Einig & Bush LLP, JJAM Trial Ex. 64.2, not all records were kept with the same degree of detail. One description, for instance, reflects a charge for eight hours of "work[ing] through documents;" another entry immediately following shows six hours billed for "work on case." Services by Einig & Bush, JJAM Trial Ex. 64.2 ("Rice Law Firm Time By Job Detail"). It is entirely unclear whether such descriptions reflect reasonable or actual costs, and, though not all entries are so vague, a 20% reduction is necessary to account for deficiencies where they appear in the records. *See Ragin v. Harry Macklowe Real Estate Co.,* 870 F. Supp. 510, 521 (S.D.N.Y. 1994) (reducing fee amount by across the board percentage for failures to describe with adequate specificity, duplicative claims, and failure to provide contemporaneous records). Therefore, the total amount allowed in attorney's fees is $214,089.74.

7. Late Fees

JJAM also requested late fees of 2% on all missed payments, and the Consolidated Note clearly authorizes such a fee. Consolidated Note ¶7. The Debtor missed eighty-three minimum payments of $9,874.19 between default and the Cutoff Date, which entitles JJAM to $16,391.15.

8. Interest on Advances

In addition to late fees, JJAM has also requested interest on the advances made for taxes, water, and insurance. However, the Consolidated Note does not permit JJAM to collect independent interest on advances. Rather, paragraph 2, which characterizes advances as "loans," governs interest on advances. Consolidated Note ¶2. Understood as additional loans added to the total principal, it is apparent that further advances do not collect an independent 5% interest in addition to the 5% that accrues monthly on the principal balance. Accordingly, advances are to be added to the total principal amount, and will accrue interest at the Consolidated Note rate as a part of that sum.

  b.   Enforceability of the Unrecorded Consolidated Mortgage and CEMA

The Debtor further challenged JJAM's claim on the grounds that the Consolidated Mortgage is voidable under § 544(a), which affords a debtor in possession "strong arm" powers of avoidance with respect to certain obligations. 11 U.S.C. § 544(a); § 1107(a) ("[A] debtor in possession shall have all the rights . . . and powers . . . of a trustee serving in a case under this chapter."). Under §544(a)(3), a debtor can assume the rights and powers of a bona fide purchaser of real property. Here, the Debtor seeks to use bona fide purchaser status to avoid the unrecorded Consolidated Mortgage.

Whether the Debtor is able to assume the role of a bona fide purchaser, and the avoidance rights that affords, is a question of state law. *See O'Connell v. JPMorgan Chase Bank Nat'l Ass'n*, No. 12-CV-1951, 2012 WL 6151972, at *2 (E.D.N.Y. Dec. 11, 2012). In New York, a subsequent good faith purchaser may avoid a prior unrecorded mortgage interest where the purchaser had neither actual nor constructive notice of such impediment in the title. *Id.* at *3; *see* N.Y. Real Prop. Law § 291-e. As the Debtor here would be assuming hypothetical bona fide

19

status, actual knowledge is immaterial; the question is only whether the Debtor had constructive notice of the encumbrance. *Id.* at *3; *see In re Euro-Swiss Int'l Corp.*, 33 B.R. 872, 882 (Bankr. S.D.N.Y. 1983). A court may imply constructive notice based on a party's knowledge of facts that would create a duty of reasonable inquiry. *Euro-Swiss*, 33 B.R. at 882. Where an awareness of certain facts "would lead a reasonably prudent purchaser to make inquiries" into those facts, the purchaser cannot later avoid an encumbrance that such inquiries would have revealed. *Chen v. Geranium Dev. Corp.*, 243 A.D.2d 708, 709 (N.Y. App. Div. 2d Dep't 1997), *appeal denied*, 91 N.Y.2d 921 (1998), *reargument denied*, 91 N.Y.2d 949 (1998).

Here, the record establishes that the Debtor was aware of facts that created a duty to inquire; it therefore cannot avoid the unrecorded Consolidated Mortgage. As accurately noted by JJAM, the recorded assignment of mortgage from MERS to FCSB explicitly references the Consolidated Mortgage. Corp. Assign. of Mortgage 600-01, JJAM Trial Ex. 33. The Debtor does not deny this assignment, and even explicitly referenced the mention of the Consolidated Mortgage in the recording documentation. Debtor's Objection to the Claim of JJAM Capital LLC 6, ECF No. 97-1. Moreover, the Forbearance Agreement, which bears Francis's signature, references the Consolidated Note, suggesting knowledge at an even earlier date that might lead to discovery of the Consolidated Mortgage. Forbearance Ag. 1, ¶1; *see O'Connell*, 2012 WL 6151972, at *3 (finding that a subsequent mortgage referencing an earlier mortgage put the trustee on notice of the prior obligation). These repeated written references to the Consolidated Note would lead a "reasonably prudent purchaser" to inquire into their meaning, and for this reason, the Debtor cannot assume the status of a bona fide purchaser.

c.   JJAM's Standing to Enforce an Accelerated Debt

The Debtor's final claim, that JJAM does not have standing to enforce an accelerated debt because the WAMU Consolidated Note and other earlier re-financings were not endorsed, is without merit. The crux of the Debtor's argument here is that, absent endorsement, JJAM is a transferee or assignee, and not a holder or holder in due course, and therefore has no standing to accelerate the debt or institute a foreclosure. *See* UCC 3-301 ("The holder of an instrument . . . may . . . discharge it or enforce payment in his own name."). The Debtor is correct that JJAM is not a holder or holder in due course under the UCC—a point that JJAM concedes—but is incorrect that JJAM is consequently unable to enforce the unendorsed note.

Under New York law, there is no requirement that a party in possession of a note maintain the status of holder to enforce the note's terms. *See Carlin v. Jemal*, 68 A.D.3d 655, 655 (N.Y. App. Div. 1st Dep't 2009). Status as either a holder *or* assignee with respect to both the mortgage and underlying note is sufficient to convey standing. *Deutsche Bank Nat'l Trust Co. v. Spanos*, 102 A.D.3d  909, 911 (N.Y. App. Div. 2d Dep't 2013), *appeal denied*, 21 N.Y.3d 1068 (2013). Thus, while an endorsement would certainly entitle JJAM to enforcement rights, possession of the mortgage and note is also sufficient. *See Deutsche Bank Nat'l Trust Co. v. Whalen*, 107 A.D.3d 931, 931 (N.Y. App. Div. 2d Dep't 2013) ("Either a written assignment of the underlying note or the physical delivery of the note prior to the commencement of the foreclosure action is sufficient to transfer the obligation." (quoting *Spanos*, 102 A.D.3d at 912)). Because there is no contention that JJAM does not possess the original loan documents first executed in favor of WAMU, JJAM is entitled to enforce those documents under New York law.

IV.    Section 1124 Cure

a.    Possibility of Cure

At the center of the Debtor's Third Amended Plan is a cure of its default under the

Forbearance Agreement and a reinstatement of the Consolidated Note pursuant to 11 U.S.C. §

1124(2). Section 1124 describes characteristics of a claim that is not impaired under a plan.

Under § 1124(2), a debtor is able to leave a creditor unimpaired by curing the effects of any

default and reinstating a debt's original maturity, thereby returning the debtor and creditor to the

*status quo ante*—that is, the position that they would have occupied had the default not

occurred.[8] *See* § 1124(2); *In re Taddeo*, 685 F.2d 24, 29 (2d Cir. 1982); *In re Lammy* 356 B.R.

168, 172 (Bankr. E.D. Pa. 2006). The ability to cure is not without limits, however. A cure is not

possible where a debt has matured under the contract's original terms; in such a case, the entirety

---

[8] In full, § 1124 reads:

> Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan--
>
> **(1)** leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or
>
> **(2)** notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default--
>
> **(A)** cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;
>
> **(B)** reinstates the maturity of such claim or interest as such maturity existed before such default;
>
> **(C)** compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
>
> **(D)** if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and
>
> **(E)** does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124.

of the debt is due, and there is no maturity to reinstate. *See In re Liberty Warehouse Assocs. Ltd. P'ship*, 220 B.R. 546, 550 (Bankr. S.D.N.Y. 1998).

The Debtor's Third Amended Plan seeks to cure and reinstate the maturity date under the Consolidated Note, rather than the more recent Forbearance Agreement, because of the default provisions in the latter document. The Forbearance agreement expired upon the Debtor's 2009 default, making the Consolidated Note's terms controlling once again. The Debtor points to the language in Paragraph 5, which stated that upon a default, the Forbearance Agreement "shall be cancelled and the original terms of the Note, including, without limitation, the interest rate, will apply as if this Agreement had never been executed." Forbearance Ag. ¶5. Because the parties agreed that the Consolidated Note would control upon default, the Debtor interprets a reinstatement of the Forbearance Agreement to be contrary to that agreement's own terms, especially because First Central already exercised its right to foreclose under the Consolidated Note.

JJAM objects to this aspect of the plan, asserting that a theoretical cure could only reinstate the Forbearance Agreement, along with its maturity date of May 2013, and therefore, the Debtor has nothing at all to reinstate. JJAM reasons that the Consolidated Note's resurrection was an effect of the Debtor's default under the Forbearance Agreement, so a cure, to the extent that it nullifies the effects of a default, would be a return to the Forbearance Agreement, and not its default terms. The *status quo ante*, according to JJAM, is under the terms of the Forbearance Agreement, the document in effect before the Debtor's most recent default.

In support of its claim, JJAM points to a series of cases in which courts have found that a cure reinstates the terms of a subsequent modification rather than those of the original, unmodified loan. Chief among these is *In re Lammy*, a chapter 13 case where debtors defaulted

23

on an initial loan, entered into a modified agreement, and subsequently defaulted on that

agreement. *Lammy*, 356 B.R. at 170. The creditor submitted a claim for the arrearage under both

agreements, and the court found that a cure of only the modified arrearage was necessary to

return the debtors to their pre-default status under the modified agreement. *Id.* at 175. While the

outcome of the case is consistent with JJAM's position, the decision neither compels nor

recommends that the Debtor here cannot reinstate the Consolidated Note.

A review of the *Lammy* decision, as well as the cases on which it relies, illuminates that

issues relating to a cure must be decided in accordance with the parties' underlying agreements.

*See Lammy*, 356 B.R. at 172; *In re Gellerman*, 263 B.R. 691, 693 (Bankr. D.R.I. 2001); *In re*

*Russo*, Case No. 01-24624, at 6 (Bankr. W.D.N.Y. 2002). The question before the courts in

*Lammy* and *Gellerman* was the amount necessary to effect a cure, while the question before the

*Russo* court was what payments would be necessary post-cure to recreate "pre-default

conditions"; yet, despite this distinction, the courts relied on the parties' underlying agreements

in each case. *Compare Lammy*, 356 B.R. at 172; *Gellerman*, 263 B.R. at 693 *with Russo*, at 6.

Thus, apart from the authorization to cure, which is provided by the Bankruptcy Code, the

remaining contours of a cure—the amount needed to give it effect, as well as what occurs once it

has been effected—are to be determined on the facts. *See Liberty Warehouse*, 220 B.R. at 548

(noting that the Bankruptcy Code provides for, but does not define, "cure"). *See generally* 11

U.S.C. § 1123(d) ("[T]he amount necessary to cure the default shall be determined in accordance

with the underlying agreement and applicable nonbankruptcy law.").

Looking to the underlying agreements in this case, the Court finds that the Debtor may

reinstate the terms of the Consolidated Note, but that the amount needed to reinstate includes the

arrears owed under both the Forbearance Agreement and the Consolidated Note. The

Forbearance Agreement's stated purpose is to permit the Debtor to cure the default under the Consolidated Note. Forbearance Ag. 1. To accomplish this, it modified certain terms of the Consolidated Note, but otherwise left that document intact. *See* Forbearance Ag. ¶11 ("[T]he terms of the Note will remain unchanged . . . and the Borrower [is] obligated pursuant to the terms thereof."). The Forbearance Agreement further provided for self-cancellation—that is, upon default, it reinstated the terms of the Consolidated Note in their entirety—a feature absent in the opinions discussed above. Forbearance Ag. ¶5. The parties are entitled to the benefit of the bargain; here, that bargain entails a cancellation of the Forbearance Agreement, and an opportunity for the Debtor to comply with the terms of the Consolidated Note.

However, JJAM correctly asserts that a cure amount of only the arrears under the Forbearance Agreement could only reinstate the Forbearance Agreement. *See Lammy*, 356 B.R. at 175-6. The Forbearance Agreement's terms were the *status quo ante* to the most recent default, and a cure amount that merely addresses those arrears would therefore reinstate the Forbearance Agreement's terms. To instead return to the terms of the Consolidated Note, an ability afforded by the Forbearance Agreement's cancellation provision, the Debtor must cure arrears in an amount sufficient to return the Debtor and JJAM to pre-default conditions under the Consolidated Note. In other words, to render the Consolidated Note's terms the *status quo ante*, the Debtor must cure the arrears under both the Forbearance Agreement and the Consolidated Note, effectively bringing the parties back to the position they occupied before the first default under the Consolidated Note.

b. Amount of Cure

For the foregoing reasons, the Court holds that the amount needed to cure and reinstate the terms of the Consolidated Note is $779,764.83. This amount is comprised of the

uncapitalized arrears of $106,726.55 under the Consolidated Note, $442,557.39 in interest accrued under the Forbearance Agreement, $214,089.74 in attorney's fees, and $16,391.15 in late fees. A payment of these amounts will return the parties to the positions that they would have held had the Debtor not defaulted on the Consolidated Note.

As discussed above, the advances made by First Central and JJAM are "loans" under the terms of the Consolidated Note, and are to be capitalized and paid under the plan, together with the remainder of the principal. The total sum of the advances is therefore not included in the cure amount.

V.    Confirmation of Debtor's Third Amended Plan and Exclusivity

a.    Confirmation

The Court cannot confirm the Debtor's Third Amended Plan on the current record. Of the requirements listed under § 1129, the Debtor has not made a sufficient showing with respect to those of legality under subsection (a)(3) and feasibility under subsection (a)(11). § 1129(a)(3), (11).

Looking first to feasibility, the Court must determine that

Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed under the plan.

11 U.S.C. § 1129(a)(11). Succinctly stated, it must be asked whether the plan is "workable and has a reasonable likelihood of success." *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725, 734 (Bankr. E.D.N.Y. 1994). To date, the Debtor has failed to show that this question can be answered affirmatively.

As an initial matter, the Debtor has indicated that it currently has $650,000 deposited in its confirmation fund, which could be put toward the effective date payment.

26

However, this amount does not satisfy the $779,764.83 needed to cure in accordance with this Decision. Despite Francis's testimony that the Debtor can easily acquire additional funds, there is little evidence beyond her bare assertion to support this conclusion. The Debtor must proffer an additional showing of further funding readily available to make the effective date payment.

To date, the Debtor similarly has not shown the feasibility of post-confirmation debt service under the plan. As the total amount of JJAM's claim has been fixed to include advances, which become part of the principal sum, it is apparent that monthly payments under the plan will exceed the $7,448.59 payments made pre-petition under the Forbearance Agreement.[9] Though the Debtor has consistently made its $5,000 adequate protection payments without default, the past payment of a lesser sum does not substantiate future ability to pay a greater sum. The Debtor must provide proof that money will be available to make post-confirmation payments.

Furthermore, JJAM has voiced meaningful concerns about the use of the Property, which implicate § 1129(a)(4)'s "forbidden by law" language. Currently, the Property is zoned for residential use, and the Certificate of Occupancy reflects the same. Certificate of Occupancy 1, JJAM Trial Ex. 38. As Francis acknowledged at the hearing, there is a likely conflict with the zoning regulations and the Certificate because the Property is being used as a residence and as corporate offices. Tr. 4-29-15 53:24-25, 54:1; *see* Definitions in Zoning Resolutions, JJAM Trial Ex. 115. An amended plan must account for this potential issue.

The Debtor is granted leave to amend the plan in accordance with this Decision.

---

[9] The prime rate has also risen from 3.25% to 3.5%, further increasing the payment amounts under a reinstated Consolidated Note.

b.   Exclusivity

Because more than twenty months have passed since the petition date, the

Debtor's request to extend the exclusive periods during which only a debtor can file a

plan and solicit votes for a plan, is now moot. *See* 11 U.S.C. § 1121(d)(2) ("(A) The 120-

day period specified in paragraph (1) may not be extended beyond a date that is 18

months after the date of the order for relief under this chapter. (B) The 180-day period

specified in paragraph (1) may not be extended beyond a date that is 20 months after the

date of the order for relief under this chapter.").

VI.    Conclusion

Secured Creditor JJAM's claim is accordingly fixed in the amount of $2,726,396.97. Of

that amount, $779,764.83 is required to cure and reinstate the terms of the Consolidated Note.

The Debtor is granted leave to amend its plan to account for these findings, and to remedy any

deficiencies such findings created in the Third Amended Plan. An Order consistent with this

Decision shall follow.

**Dated: March 30, 2016**
**Brooklyn, New York**

**Nancy Hershey Lord**
**United States Bankruptcy Judge**

28