UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                                                    Chapter 11
                                                                          Case No. 1-14-40786-nhl

Etienne Estates at Washington LLC,

                                            Debtor.

------------------------------------------------------------X


**MEMORANDUM OPINION AND ORDER ON MOTION TO COMPEL**


APPEARANCES:

Kevin Nash                                                    Mark A. Frankel
Goldberg Weprin Finkel Goldstein LLP          Backenroth Frankel & Krinsky, LLP
1501 Broadway, 22nd Floor                          800 Third Avenue, 11th Floor
New York, NY 10036                                    New York, NY 10022
*Attorney for the Debtor*                              *Attorney for JJAM Capital LLC*


NANCY HERSHEY LORD
UNITED STATES BANKRUPTCY JUDGE

Before the Court is the motion (the "Motion") of JJAM Capital LLC ("JJAM") to compel Etienne Estates at Washington LLC (the "Debtor") to comply with terms of the Debtor's confirmed Revised Third Amended Chapter 11 Plan of Reorganization (the "Plan"). Mot. to Compel, ECF No. 215; Plan, ECF No. 167; *see* Confirmation Order, ECF No. 209. At issue here is the portion of the Plan providing for the cure and reinstatement of a Consolidated Adjustable Rate Note, executed September 28, 2006 by the Debtor and JJAM's predecessor in interest (the "Consolidated Note"), and whether certain provisions in the Plan and order confirming the Plan (the "Confirmation Order") altered the Debtor's monthly payment obligations under that instrument.

JJAM's position is that, consistent with 11 U.S.C. § 1124(2), the Consolidated Note was reinstated by the Plan according to its original terms, and therefore requires that, as of September 28, 2016, the Debtor make monthly payments to JJAM consisting of both interest and amortization components.[1] Combined, these amounts yield a monthly payment of approximately $20,000. The Debtor has contested this interpretation of the Plan, and argues instead that the terms of the Consolidated Note were effectively altered to require interest-only payments through September of 2031, when the full principal balance will become due. From the Debtor's perspective, monthly payments are approximately $9,000. The Debtor acknowledges that its interpretation would result in the Plan calling for an "imperfect" cure and reinstatement, but asserts that this is nevertheless what the now-binding Plan requires.

The resolution of this dispute turns, in large part, on the correct interpretation of the Plan and Confirmation Order. However, adding an additional wrinkle to these arguments is that amortization had not been so much as mentioned at any point in this case prior to July of 2017,

---

[1] 11 U.S.C. §§ 101 *et seq.* may be referred to throughout as the "Bankruptcy Code." References to "§ ___" are to sections in the Code unless otherwise specified.

despite the fact that the Consolidated Note was at the center of considerable litigation over JJAM's claim leading up to the entry of the Confirmation Order. The Court therefore requested that the parties brief the issues of equitable estoppel and waiver as they might apply to JJAM's argument.

For the reasons that follow, the Court has determined that an evidentiary hearing is necessary to develop a more robust record as to the intent of the parties.

## Background

On March 30, 2016, after a five-day evidentiary hearing over confirmation and the Debtor's objection to JJAM's proof of claim, the Court issued a decision that fixed JJAM's claim and permitted the Debtor to cure and reinstate the Consolidated Note pursuant to § 1124(2) (the "March 30 Decision"). Mar. 30 Decision, ECF No. 165. The portion of the Consolidated Note relevant to the current dispute divides the life of the loan into two periods. *See* Consol. Note ¶ 1, ECF No. 215-1. The first period, called the "Draw Period," lasted for the first sixty months of the loan, and was later extended to 120 months. *Id.*; *see* JJAM Mot. ¶ 9, ECF No. 215. The parties agree that, with the extension, the Draw Period would have expired on September 28, 2016. The second period, the "Repayment Period," made up the following 180 months. *Id.* Paragraphs 3.E and 3.F of the Consolidated Note then go on to explain the Debtor's monthly payments during those periods. They provide:

> E. During the Draw Period, my "Minimum Payment Due" equals all unpaid finance charges, credit life insurance premiums, and other charges imposed during the billing cycle together with any "Amount Past Due." My "Minimum Payment Due" during the Draw period will not reduce the principal balance that is outstanding on My Account.

> F. During the Repayment Period, my "Minimum Payment Due" equals 1/180 of the outstanding principal balance of my Account as of the last day of the Draw Period plus all unpaid finance charges, credit life insurance premiums and other charges imposed during the billing cycle together with any "Amount Past Due."

*Id.* ¶ 3. It is the treatment of the amortization component of the "Minimum Payment Due" during the Repayment Period, equal to "1/180 of the outstanding principal balance," that is at issue here. *See id.*

The confirmation aspect of the evidentiary hearing focused on feasibility, and, in the March 30 Decision, the Court declined to confirm the Debtor's then proposed plan on that ground. *See* Mar. 30 Dec. 26–27, ECF No. 165. However, the dispute over feasibility never touched on the issue of amortization, or that fact that it would nearly double the Debtor's post-confirmation debt service. JJAM's confirmation objection was ultimately overruled in part at a hearing on June 22, 2016.

Disputes persisted after this hearing over additional, relatively minor adjustments also unrelated to amortization. These disputes led to a motion to reconsider the Court's calculation of JJAM's claim as set by the March 30 Decision, *see* Dec. on Reconsideration, ECF No. 191, and later, after a decision on that motion, to a settlement of the outstanding issues between the parties that was read into the record of the February 2, 2017 hearing, *see* Feb. 2 Tr., ECF No. 202. Then, on May 23, 2017, the Court entered the Confirmation Order. ECF No. 209. The Plan it confirmed provides for the reinstatement of the Consolidated Note, and therefore classifies JJAM as unimpaired. The Plan addresses the Consolidated Note as follows:

> Following the Cure, the Consolidated Note shall be deemed reinstated according to its original terms through and pending the maturity date of September 2031 ("Maturity"). Based upon the Decision, the remaining outstanding indebtedness has been fixed in the sum of $1,946,632.14 (subject to final adjustments). This new balance in the final amount specifically determined in connection with the Confirmation Hearing, shall bear interest at the current prime rate of 3.50 plus the margin of 1.75 fixed in the Consolidated Note, for a total of 5.25% per annum. Monthly interest payments of $8,516.52 per month shall resume thirty (30) days after the Effective Date until Maturity, whereupon the full new balance shall become due and owing. All other terms and conditions of the Consolidated Note

shall remain in place including future adjustments resulting from future increases
or decreases to the Prime Rate.

Plan ¶ 3.1, ECF No. 167.

Certain paragraphs in the Confirmation Order also focus on the terms of the Consolidated

Note's reinstatement. Of particular relevance is Paragraph 5, which provides:

> The New Principal Balance shall bear interest at the current prime rate of 3.75, plus
> the margin of 1.75 fixed in the Consolidated Note, for a total of 5.50% per annum,
> or $9,137.46 for every 30 day billing cycle, subject to future adjustments resulting
> from future increases or decreases to the Prime Rate as provided for in the
> Consolidated Note. Monthly payments of the Minimum Amount Due under the
> Consolidated Note shall resume on April 1, 2017 for the period covering March 1,
> 2107 through March 31, 2017. JJAM shall provide monthly bills in accordance with
> the Consolidated Note.

Conf. Order ¶ 5, ECF No. 209. The Confirmation Order further states that "[a]ll other terms and

conditions of the Consolidated Note and the Consolidated Mortgage shall remain in full force

and effect," *id.* ¶ 7, and that the Confirmation Order "shall control in the event of any

inconsistency with the Plan," *id.* ¶ 13.

## Discussion

### Contract Interpretation

A confirmed plan is interpreted according to the principles of contract law. *In re AMR

Corp.*, 562 B.R. 20, 28 (Bankr. S.D.N.Y. 2016) (quoting *MF Glob. Holdings Ltd. v.

PricewaterhouseCoopers LLP*, 43 F. Supp. 3d 309, 313 (S.D.N.Y. 2014)). Under New York law,

the primary objective of contract interpretation is to "give effect to the intent of the parties as

revealed by the language of their agreement." *In re DPH Holdings Corp.*, 553 B.R. 20, 26

(Bankr. S.D.N.Y. 2016) (quoting *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.,

N.A.*, 773 F.3d 110, 113–14 (2d Cir. 2015)). In the case of a plan, the agreement consists of "all

documents which were confirmed together to form the contract." *Id.* (quoting *In re WorldCom,*

*Inc.* 352 B.R. 369, 377 (Bankr. S.D.N.Y. 2006)). Within that framework, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms," without recourse to evidence outside of the document itself as a means of determining intent. *AMR*, 562 B.R. at 28–29 (quoting *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)).

The exception to that latter principle arises when the contract is ambiguous. *Id.* Ambiguity exists when a contract provision is "susceptible to more than one reasonable interpretation." *Id.*; *see also DPH Holdings*, 553 B.R. at 26 (quoting *Chesapeake* Energy, 773 F.3d at 113–14); *Chiusano v. Chiusano*, 55 A.D.3d 425, 425 (N.Y. App. Div. 1st Dep't 2008). The issue does not arise merely because the parties disagree over the meaning of a provision, or when one party's interpretation "strains the contract language beyond its reasonable and ordinary meaning." *DPH*, 553 B.R. at 26 (citing *Law Debenture Tr. Co. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)). However, a court must also avoid an interpretation of the terms' reasonable and ordinary meanings that gives rise to an absurd result. *Id.* ("[W]ords should be given the meanings ordinarily ascribed to them and absurd results should be avoided." (quoting *SR Int'l Bus. Ins. Co. v. Allianz Ins. Co.*, 343 Fed. App'x 629, 632 (2d Cir. 2009))).

Here, both parties have offered reasonable, and even convincing, interpretations of the Plan. One the one hand, to the extent that the Consolidated Note provides for monthly payments with an interest portion in both the Draw Period and the Repayment Period, the provisions from the Plan and Confirmation Order that discuss interest, quoted above, could easily be read to have no impact on amortization. The Plan provides that "[m]onthly interest payments of $8,516.52 per month shall resume thirty (30) days after the Effective Date to Maturity, whereupon the full new balance shall become due and owing." Plan ¶ 3.1, ECF No. 167. This harmonizes with the

provision in the Confirmation Order that increases the interest amount due to an increase in the prime rate, but then states that "[m]onthly payments of the Minimum Amount Due under the Consolidated Note shall resume on April 1, 2017." Conf. Order ¶ 5, ECF No. 209. Taken together, these provisions, along with the corresponding paragraphs in the Consolidated Note, could be read to mean that interest is being fixed by the Plan and Disclosure Statement, but not that interest is the only amount included in the Minimum Amount Due. This reading is then reinforced by references throughout to the fact that the Consolidated Note was otherwise being reinstated according to its terms. *See* Plan ¶ 3.1; Conf. Order ¶¶ 4, 7.

On the other hand, this reading ascribes a dubious meaning of "full new balance" as it appears in the Plan. It requires understanding that term to include only additional charges or unpaid sums that may still exist in September of 2031. However, the term "new balance," while not a defined term, refers back to the amount of the total indebtedness fixed by the Court's March 30 Decision. *See* Plan ¶ 3.1. In this light, the later statement that the "full new balance" becomes due at maturity would appear to mean that no payments prior to the maturity date would reduce the principal balance. In other words, there would be a balloon payment, and no amortization component to the monthly payments. Further, this reading of Paragraph 3.1 of the Plan is no less in harmony with other provisions discussed in the Confirmation Order, or those that state that other provisions of the Consolidated Note are being reinstated as they appear in that document. Indeed, on this reading, what is being reinstated would include everything in the Consolidated Note aside from the amount due each month.

These two interpretations are both reasonable, and the Court therefore concludes that the Plan is ambiguous. Choosing between these interpretations is not made easier by referring to either the disclosure statement or the settlement read into the record of the February 2, 2017

hearing. *See* Disc. State., ECF No. 108; Feb. 2 Tr., ECF No. 202. Though the disclosure statement refers to the Draw Period and the Repayment Period, it does not make any mention of the amounts due during those times, or to amortization. *See* Disc. State., ECF No. 108. Similarly, there is no reference to amortization at the February 2, 2017 hearing, and the terms of agreement read into that record, including JJAM's assertion that "none of the other terms of the loan are modified" beyond those expressly discussed, could, on this Court's understanding, comport with either interpretation of the Plan discussed above. Feb. 2 Tr., ECF No. 202. As the Debtor points out, specific terms in a contract override general terms. *See In re Arcapita Bank B.S.C.(c)*, 520 B.R. 15, 26 (Bankr. S.D.N.Y. 2014) (citing *Bowmer v. Bowmer*, 50 N.Y.2d 288, 294 (1980)). Here, while reading the Plan to include amortization payments is reasonable, the specific terms make an equally compelling case for reading amortization out.

Moreover, the fact that reading amortization out of the Consolidated Note means that the reinstatement was not consistent with 11 U.S.C. § 1124(2) and, in turn, that the Plan was not consistent with § 1129(a)(1), does not resolve the issue. To be sure, "when multiple interpretations of a plan are possible, courts should favor an interpretation that is consistent with the Bankruptcy Code over one that contravenes it." *In re Forklift LP Corp.*, 363 B.R. 388, 394 (Bankr. D. Del. 2007). Yet, here, there is no interpretation of the plan that achieves that aim. If the Plan were read to require amortization, it would not, by the Debtor's own admission, be feasible, and therefore would contravene § 1129(a)(11).

Ultimately, then, the Court must resolve the ambiguity with evidence indicative of the parties' intent that is extrinsic to the Plan itself. However, the current record before the Court is insufficient to discern whether both parties actually anticipated reinstating a note that entailed an

amortization component. Making such a finding will therefore require an evidentiary hearing to determine what each party was aware of, and when.

### Estoppel and Waiver

The doctrines of equitable estoppel and waiver, which the parties briefed at the Court's request, are similarly dependent on intent. *See In re Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d  84, 90 (2d Cir. 2013) (noting that equitable estoppel requires, in part, a showing of [a]n act constituting a concealment of facts or misrepresentation," and "[a]n intention or expectation that such acts will be relied upon" (quoting *Gen. Elec. Capital Corp. v. Armadora, S.A.,* 37 F.3d 41, 45 (2d Cir. 1994))); *Hadden v. Consol. Edison Co. of N.Y.*, 45 N.Y.2d 466, 469 (1978) (defining waiver as "the intentional relinquishment of a known right").

Here, the threshold issue is what the terms of the Plan actually require. Depending on the outcome of that determination, JJAM may have a right to amortization, but could be estopped from raising the issue, or otherwise have waived its right to do so. Alternatively, it may not have the right to claim amortization in the first instance. In either case, a more developed record on the issue of intent is needed. This is true not just of JJAM, but of the Debtor as well, against which, as JJAM has argued, the doctrines may be applied.

*[The remainder of this page is intentionally left blank.]*

## Conclusion

For the reasons set forth above, the Court will hold an evidentiary hearing to resolve the open question of each party's understanding of the Consolidated Note, and how each understood itself to be implementing that document.

Dates for a scheduling order will be determined at the status hearing currently set for October 11, 2018 at 11:00 a.m.

**IT IS SO ORDERED.**



**Dated: September 30, 2018**
**Brooklyn, New York**

**Nancy Hershey Lord**
**United States Bankruptcy Judge**