UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

In re,                                                    Chapter 11

Etienne Estates at Washington LLC,                        Case No. 14-40786(nhl)

                              Debtor,

-------------------------------------------------------------------X

## BRIEF STATEMENT OF JJAM LLC REGARDING CONTESTED MATTER

Pursuant to the "Amended Contested Matter Scheduling Order" (ECF # 176, "Scheduling Order"), whose dates were adjourned on the consent of the Court and all parties by a letter by the undersigned Yan Margolin, Esq., special counsel for Creditor JJAM Capital LLC (ECF # 279), Creditor now files this Statement.

### Statement as to Disclosure Under Section B of the Scheduling Order

The Creditor and Debtor have exchanged discovery that is satisfactory to Creditor.  The parties have agreed to waive depositions of all parties, and have agreed that communications between each party and their actual counsel for the underlying Bankruptcy Proceeding are privileged.

The Creditor reserves the right to object to any document it deems privileged or inadmissible pursuant to the Federal Rules of Evidence, including FRE § 408.

### WITNESS AND EXHIBIT LIST AND LENGTH OF PRESENTATION

The Creditor intends to call the following witnesses for its case in chief:  Mark Frankel, Esq., and Kevin Nash, Esq.  In the event there are issues of admissibility regarding certain documents, the Creditor may need to call Ted Donovan, Esq., to authenticate those documents.

The Creditor further anticipates calling Adam Nagin and Johanna Francis as rebuttal or rehabilitation witnesses.

The Creditor believes the length of the presentation shall be approximately 2 hours for the direct testimony of Mark Frankel, and between 1 to 2 hours for the testimony/cross-

examination of Kevin Nash.

The Creditor and Debtor have agreed to a joint list of exhibits to be used for both cases-in-chief which the parties have already agreed are authentic and admissible.  The Creditor and Debtor have agreed to not include impeachment or rehabilitation exhibits into their trial binders.  The entirety of Creditor's case-in-chief exhibits are included in the joint binder with exhibits numbered "1" through "43."

### The Issues of Fact To Be Determined

The parties have assembled a joint list of "undisputed facts" which was filed on November 1, 2019.  The issues of fact that Creditor believes must be determined at trial are whether amortization was, or needed to be, raised by either party before July 26, 2017, what the expressed and reasonable intent of the parties was when reinstating the Consolidated Note, and whether the respective parties induced reliance from the other such as to satisfy waiver or estoppel doctrines.  Specifically:

1. Whether amortization as included in both the "Consolidated Note" and the "HELOC" was brought up or discussed by the parties before February 21, 2017.  JJAM believes the answer to this question is "yes."

2. Whether the phrase "Minimum Amount Due" or "Minimum Payment Due", used interchangeably, as described in the Note require amortization payments once the Note has entered the "repayment period."  JJAM believes the answer to this question is "yes."

3. Whether the Third Amended Plan (ECF # 99) called for the amortization terms under Section 3 of the Consolidated Note to be preserved.  JJAM believes the answer to this question is "yes."

4. Whether some part of the changes made by Debtor's attorneys in converting the Third Amended Plan to the Revised Third Amended Plan (ECF # 167) were in contravention of Court Order, illegal, and in bad faith.  JJAM believes the

answer to this question is "yes."

5.  Whether the Disclosure Statement (ECF # 168) filed by Debtor along with the Revised Third Amended Plan was both affirmatively deceptive and deceptive by omission of alterations to the Third Amended Plan. JJAM believes the answer to this question is "yes."

6.  Whether the changes made to the Revised Amended Plan explicitly stated that JJAM, as a creditor, would be deprived of a right under the Code, including reinstatement of the original maturity date. JJAM believes the answer to this question is "no."

7.  Whether JJAM had a rational reason to believe, at any point, that its right to amortization was in danger of being stripped by either the Third Amended Plan (98), the Revised Third Amended Plan (167), or the Notice of Plan Revision (168). JJAM believes the answer to this question is "no."

8.  Whether Debtor's abandonment of *Till* cramdown plans and a proposal of a full reinstatement Third Amended Plan evidenced intent by the Debtor to pay amortization under the Note. JJAM believes the answer to that question is "yes."

9.  Whether JJAM had already opposed converting the loan to interest-only in the first three plan (ECF # 89) and Debtor conceded that position, and in turn whether JJAM could rely on that concession to believe it was now due amortization under the Third Amended Plan. JJAM believes the answer to these questions is "yes."

10. Whether Kevin Nash, lead attorney for Debtor, knew or should have known that the Consolidated Note called for amortization of principal from February of 2015 to May of 2017. JJAM believes the answer to this question is "yes."

11. If the answer to the above question is yes, whether Mark Frankel knew that Kevin Nash was, at any point in the litigation, attempting to change the Note as

to amortization.  JJAM believes the answer to this question is that Mark Frankel did not, and should not have, known that Kevin Nash was attempting to change amortization terms in the Note until February of 2017.

12. Whether, in the event that Kevin Nash did not know that the Note contained a requirement of amortization during the Repayment Period, such lack of knowledge was due to the error or carelessness of Mr. Nash himself, or due to a good-faith belief.  JJAM believes the answer to the first question is "yes" and the answer to the second question is "no."

13. Whether Mark Frankel, lead attorney for JJAM, knew that the Consolidated Note called for amortization of principal from February of 2015 to May of 2017. JJAM believes the answer to this question is "yes."

14. If the answer to the above question is yes, whether Kevin Nash knew that Mark Frankel expected JJAM to preserve it amortization rights.  JJAM believes the answer to this question is "yes."

15. Whether the JJAM was obligated to explicitly and repeatedly demand amortization in order to receive it under a plan seeking to reinstate the Consolidated Note pursuant to 11 U.S.C. § 1124, and whether it did so sufficiently.  JJAM believes the answer to these questions is that JJAM was not thus-obligated, but did explicitly and repeatedly demand amortization nonetheless.

16. Whether Debtor was obligated to affirmatively disclose any attempts to change the amortization term under the Consolidated Note, and whether it did so sufficiently.  JJAM believes the answer to these questions is that Debtor was that obligated, and failed to sufficiently satisfy this obligation.

17. Whether Kevin Nash accepted the changes to the proposed Confirmation Order by Mark Frankel sent to Mr. Nash on February 21, 2017, and February 22, 2017 despite full opportunity to refuse said changes, and whether this acceptance in

turn evidenced an intent to modify the Confirmation Order to overwrite Section 3.1 of the Revised Third Amended Plan. JJAM believes the answer to these questions is "yes."

18. Whether Mark Frankel's changes to the proposed Confirmation Order and the accompanying emails and explanations sent to Kevin Nash on February 21, 2017, and February 22, 2017 were in good faith and full disclosure. JJAM believes the answer to these questions is "yes."

19. Whether JJAM's statements at the February 2, 2017 conference, as well as its proposed changes to the Confirmation Order drafts made on February 21, and February 22, 2017, which Debtor accepted, sufficiently raised the issue of amortization before the Confirmation Order was signed on May 11, 2017. JJAM believes the answer to that question is "yes."

20. That if the Court finds that JJAM, at one or more individual instances neglected to request or bill for the amortization due under the Note, such instances do not evidence a broader and affirmative intent to abandon amortization under the Note. JJAM believes the answer to this question is "yes", meaning they do not constitute such intent.

21. Whether the Paragraphs 2, 3, 4, 5, 7, 13, and 14 of the "Order Confirming Debtor's Revised Third Amended Chapter 11 Plan of Reorganization" (ECF # 209), as well as the testimony of February 2, 2017, result in JJAM being entitled to amortization payments pursuant to Section 3 of the Note, and whether these Paragraphs over-ride the terms of Section 3.1 of the Revised Third Amended Plan, including any mention of a "maturity date", "maturity", or "whereupon the full new balance shall become due and owing." JJAM believes the answer to both these questions is "yes."

22. Whether the final reading of the Order of Confirmation (209), the Revised Third Amended Plan (167), and the "Consolidated Note" show that the only logical

result is that amortization payments of the principal now owed under the Note

are owed by Debtor.   JJAM believes that the answer to this question is "yes."

23. Whether the Debtor stated that JJAM would be unimpaired in both the Third

Amended Plan and Revised Third Amended Plan, and whether JJAM

reasonably relied, to its detriment, on above statements. JJAM believes the

answer to these questions is "yes."

24. Whether JJAM ever affirmatively and explicitly agreed that the Note's term for

repaying principal would be altered by the reinstatement, and whether the

Debtor reasonably relied, to its determinant, on the above agreement, if they

occurred.  JJAM believes the answer to these questions is "no."

25. Whether there was "active recognition the existence of a balloon payment" by

both parties as alleged by the Debtor.  JJAM believes the answer to this question

is "no."

26. Whether the cure payments made to reinstate the Note by Debtor were "in

reliance" on amortization not being due under the Confirmation Order and Plan,

as alleged by Debtor.  JJAM believes the answer is "no."

27. Whether feasibility at the 2015 trial was based on the Third Amended Plan (98)

providing "for a balloon payment at maturity" as alleged by Debtor.  JJAM

believes the answer to this question is "no."

28. If the Court finds that JJAM was required to explicitly demand amortization,

whether JJAM improperly "delayed its demand for amortization" as claimed by

the Debtor.  JJAM believes the answer to this question is "no."

29. Whether JJAM's conduct constituted "multiple instances of deliberate conduct"

or "lapse of a substantial period of time without attempting to enforce" its rights

that provide the "necessary predicate for invoking the doctrine of waiver" as to

amortization as claimed by Debtor.  JJAM believes the answer to this question

is "no."

30. Whether the actions of Debtor and its counsel from the February 2, 2017
    hearing before the Court until present waived any right to avoid amortization
    that the Debtor alleges it possesses.  JJAM believes the answer to this question
    is "yes."

31. Whether JJAM, from February of 2017 to present, had a reasonable expectation
    that amortization would be paid.  JJAM believes the answer to this question is
    "yes."

32. Whether, in the event that the Court requires amortization payments, and said
    payments in fact result in the Confirmed Plan not being ultimately feasible,
    whether such non-feasibility is totally or primarily caused by Debtor's and
    Debtor's principal's misuse of Debtor's assets.  JJAM believes the answer to this
    question is "yes."

33. Whether the 2015 Trial had any mention of a "balloon payment" at "maturity"
    as the method of principal repayment of the amount due under either the Note or
    the HELOC.  JJAM believes the answer to this question is "no."


**The Issues of Law To Be Determined**

The issues of law to be determined pursuant both to the Court's "Memorandum
Opinion and Order on Motion to Compel" (ECF # 259) dated September 30, 2018 and the
various briefings on the Motion to Compel by JJAM (ECF #'s 215, 218, 221, 223, 234, 240,
and 246", as well as multiple hearings on the Motion to Compel from July 26, 2017 through
October 11, 2018, are relate to whether the Confirmed Order and Third Revised Amended
Plan, together with the Note, are ambiguous, how that ambiguity is to be interpreted based on
the facts, and whether the prevailing party on ambiguity is estopped or has waived its rights.
Specifically:

1. Whether the final product of reading the Confirmation Order (209), the Revised

Third Amended Plan (167) and the Note together results in ambiguity. JJAM believes that the combined reading unambiguously results in amortization pursuant to Section 3 of the Note.

2. In the event that the Court's answer to question "1" above is that there is ambiguity, the question is then whether JJAM's reading that the language in the Confirmation Order (209) over-rides the language of Section 3.1 of the Revised Third Amended Plan (167), is correct after using extrinsic evidence, include the parties' respective intent, to resolve the ambiguity. JJAM believes the answer to this question is yes.

3. In the event that the Court's answers to questions 1 and 2 results in a finding that Section 3.1 of the Plan, particularly those referencing "maturity" or when the "full new balance" is owed, control over conflicting terms in the Confirmation Order, whether the Plan still calls for amortization given that the Note is reinstated pursuant to 11 U.S.C. § 1124, which in turn requires that the maturity date of the Note be preserved. JJAM believes the answer to this question is "yes."

4. Whether, the Plan as confirmed would violate the law, including but not limited to 11 U.S.C. § 1124(2), if JJAM's right to amortization under the Note was eliminated, as a matter of law. JJAM believes the answer to this question is "yes."

5. Whether the Plan as confirmed would violate the law, specifically 11 U.S.C. 1129(a)(1), if JJAM's right to amortization under the Note was enforced in JJAM's favor, as a matter of law. JJAM believes the answer to this question is "no."

6. Whether, as a matter of law, due to the default and acceleration of the Note previous to the entry of the Confirmation Order, and due to the stipulation and order for adequate protection payments, JJAM could not have demanded

amortization payments under the Note until May 23, 2017, when the Confirmation Order was entered. JJAM believes the answer to this question is "yes."

7. Whether, if the Court finds that JJAM's interpretation of the Confirmation Order, Plan, and Note are correct, JJAM has waived its right to amortization, or should be equitably or judicially estopped from enforcing that right. JJAM believes the answer to this question is "no."

8. Whether, if the Court finds that Debtor's interpretation of the Confirmation Order, Plan, and Note are correct, Debtor has waived its right to avoid amortization, or should be equitably or judicially estopped from enforcing that right. JJAM believes the answer to this question is "yes."

9. Whether, as a matter of law, JJAM had a duty to explicitly and affirmatively raise its right to amortization under the Note on or before February of 2017, and whether JJAM failed to do so. JJAM believes to answer to these questions is no."

10. Whether, as a matter of law, any grounds for non-confirmation or non-feasibility of a Plan not raised during a hearing are subsequently waived by a creditor as alleged by the Debtor. JJAM believes the answer to this question is "no."

11. Whether JJAM reliance on the statements by Debtor that it would be "unimpaired" under both Plans was reasonable as a matter of law. JJAM believes the answer to this question is "yes."

12. Whether Debtor could, as a matter of law, rely on any alleged failure by JJAM to raise or raise more substantially, its entitlement to amortization under the Note at any stage in this Bankruptcy. JJAM believes the answer to this question is "no."

13. Whether, if the Court finds that Debtor's interpretation of the Order, Plan, and

Note are correct, the doctrine of *res judicata* prevents the Court from enforcing the Debtor's right to not repay principal via amortization under the Confirmed Order and Plan as a matter of law.  JJAM believes the answer to this question is "yes."

14. Whether, if the Court finds that JJAM's interpretation of the Order, Plan, and Note are correct, the doctrine of *res judicata* prevents the Court form enforcing any alleged waiver or estoppel to the right to amortization as claimed by the Debtor.  JJAM believes the answer to this question is "yes."

15. Whether JJAM ever took an inconsistent position regarding amortization from the filing of this Bankruptcy case to present, prevailed on that position, and that the above would confer an unfair advantage upon JJAM or impose an unfair detriment upon Debtor as a matter of law.  JJAM believes the answer to these questions is "no."

16. Whether Debtor ever took an inconsistent position regarding amortization from the filing of this Bankruptcy case to present, prevailed on that position, and that the above would confer an unfair advantage upon Debtor or impose an unfair detriment upon JJAM as a matter of law.  JJAM believes the answer to this question is "yes."

17. In the event the Court finds that JJAM failed to properly or sufficiently insist on amortization payments during the Bankruptcy, whether Debtor had, as a matter of law, the ability to reasonably rely on the above failure in paying cure amounts due under the Note, Plan, and Confirmation Order.  JJAM believes the answer to this question is "no."

18. Whether the Confirmation Order is the product of a legally-binding agreement or contract between the parties, and its terms properly supersede the Plan and Note whenever in conflict as a matter of law.  JJAM believes the answer to this question is "yes."

19. Whether, as a matter of law, the terms of the Note that the Court modified in the Confirmation Order, specifically the application of RPAPL § 1304, suggest that all other terms of the Note, as a matter of law, remain unchanged. JJAM believes the answer to this question is "yes."

20. Whether, as a matter of law, Debtor could have been improperly induced into performing obligations that it had a previous contractual or legal duty to perform. JJAM believes the answer to that question is "no."

21. Whether it is a creditor's burden to object to a Plan resulting in its impairment in the event that the debtor advancing the Plan in question states, inaccurately, that the creditor will not impaired and is not entitled to vote on the Plan. JJAM believes the answer to this question is "no."

22. Whether JJAM's interpretation of the Confirmed Order favors the Bankruptcy Code over Debtor's interpretation. JJAM believes the answer to this question is "yes."

23. Whether the extrinsic evidence, including intent of the parties, favor JJAM's interpretation of the Confirmation Order, Plan, and Note. JJAM believes the answer to this question is "yes."

24. Whether, as the Debtor was the party drafting the first draft and majority of the language of the Confirmation Order, the doctrine of *contra preferentum* requires that the Court interpret the Confirmation Order, Plan, and Note against Debtor. JJAM believes the answer to this question is "yes."

25. Whether absent expressly-stated language that depriving JJAM of amortization, JJAM cannot be, as a matter of law, deprived of that right. JJAM believes the answer to this question is "yes."

26. Whether any change to the maturity date or repayment of principal under the Note constitutes "impairment" under the Bankruptcy Code, specifically § 1124(2). JJAM believes the answer to this question is "yes."

27. Whether "intent" as necessary to interpret an ambiguity in a document(s)
   includes only expressed intent and agreement, rather than unilateral expressions
   of intent post-contract, or uncommunicated subjective or internal intent.  JJAM
   believes the answer to this question is "yes."

28. Whether "intent" as necessary to interpret an ambiguity in a document(s) should
   be based on what a reasonable person in the position of the parties thought was
   meant.  JJAM believes the answer to this question is "yes."

29. Whether a party can invoke the defense of waiver based on alleged reliance that
   occurred after the other party demanded the rights the first party now claims it
   waived.  JJAM believes the answer to this question is "no."

Dated:  New York, New York
        November 1, 2019

LAW OFFICE OF YAN MARGOLIN

By:_____
     Yan Margolin, Esq.
     315 West 36th Street
     New York, New York 10018
     (212) 964-6200

     *Attorneys for Creditor JJAM Capital LLC*

CC:
        Ronald Terenzi, Esq. (via ECF)
        Mark Frankel, Esq. (via ECF)
        Kevin Nash, Esq.  (via ECF)
        Ted Donovan, Esq. (via ECF)
        Nazar Khodorovsky, Esq.  (via ECF)